UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 09-12133-RGS

KENNETH EDLOW

v.

RBW, LLC

<u>MEMORANDUM AND ORDER ON
DEFENDANT'S MOTION TO DISMISS</u>

May 21, 2010

STEARNS, D.J.

Plaintiff Kenneth Edlow brought this lawsuit in Suffolk Superior Court alleging common-law claims for breach of contract (Count I); breach of the duty of good faith and fair dealing (Count II); rescission for unconscionability (Count III); misrepresentation (Count IV); violations of the Massachusetts Consumer Protection Act (Mass. Gen. Laws ch. 93A, §§ 2, 9) (Count V); and declaratory judgment (Mass. Gen. Laws ch. 231A, § 1, et seq.). On December 16, 2009, defendant RBW, LLC (RBW) removed the action to federal court on diversity grounds. RBW then moved to dismiss the Complaint pursuant to Fed. R. Civ. P. 12(b)(6). A hearing on the motion was held on May 5, 2010.

<u>BACKGROUND</u>

The facts in the light most favorable to Edlow as the non-moving party are as follows. RBW is the developer of a luxury condominium project at Battery Wharf in the North End of Boston (Battery Wharf). The Battery Wharf project has three components: a luxury hotel, commercial space, and residential condominiums. In 2004, RBW began marketing the condominiums, the construction of which had not yet been completed. The

marketing materials featured a number of planned amenities, including luxury hotel services, a restaurant managed by a Michelin three-star chef, and an expansive 18,000 square foot spa.

On December 13, 2004, Edlow signed Purchase and Sale (P&S) Agreements for condominium units 3311, 4311, and 4310. Edlow, an investment banker, bought two of the units on speculation. He planned to use the third as an occasional residence. Edlow agreed to pay $3.2 million each for units 3311 and 4311, and $1.8 million for unit 4310. The P&S Agreements required Edlow to deposit 5 percent of the purchase price at the signing, an additional 5 percent six months later, and another 10 percent eighteen months after the signing, for a total of 20 percent. P&S Agreement(s) § 3(b). Edlow paid the required deposits on the respective dates due.

Over the next three years, progress on the construction of Battery Wharf fell behind schedule. Although the closing date on Edlow's units was originally to take place on February 25, 2008, the construction delays forced a postponement. Edlow alleges that by early 2008, RBW knew that the designated hotelier, Regent International Hotels (Regent), was unable or unwilling to go forward. On April 20, 2008, Edlow inspected Battery Wharf with RBW representatives in tow. Neither the hotel nor the restaurant had opened, and the spa had not been built. An unnamed RBW representative assured Edlow that the project would be completed and that "all promised amenities would be available." Compl. ¶ 12. No mention was made of Regent's imminent ouster.[1]

---

[1]The Complaint speaks of "RBW's likely termination from the project," but Edlow's Opposition makes clear that the intended reference is to Regent. Opp'n at 4.

On May 15, 2008, Edlow and RBW agreed to revise the P&S Agreements. The purchase of unit 4311 was rescinded and the deposit ($640,000) was credited against the balance Edlow owed on unit 4310. In return, Edlow agreed to close immediately on unit 4310 and to close on unit 3311 within three months. Edlow closed on unit 4310 on May 15, 2008, as agreed.

On June 10, 2008, RBW informed Edlow in writing that Regent was withdrawing from the project. RBW also stated that "[t]he Spa, the Restaurant located at 2 Battery Wharf and the Café at 5 Battery Wharf are scheduled to [open] in early 2009." Id. ¶ 14. On July 7, 2008, RBW informed Edlow that the hotel chosen to replace Regent would not offer the concierge and property management services promised in the marketing materials. Edlow nonetheless signed and returned a copy of the May 15, 2008 agreement on July 27, 2008.

The closing on unit 3311 was to take place on August 15, 2008. The week before, Edlow balked. "The project had no hotel, or even a hotel operator, in place. The project had no spa, much less the 18,000 [square] foot state-of-the-art facility RBW had promised Edlow. Nor did Battery Wharf have a restaurant, nor the promised business center and conference rooms, nor any of the other elements of the promised package of lifestyle amenities." Compl. ¶ 17. Edlow also alleges that RBW failed to inform him of modifications it had "secretly" made to the Master Deed. Id. ¶ 20. According to the Complaint, RBW invoked "obscurely buried" provisions in the Master Deed to convert waterfront patio areas intended for the use of condominium residents into a seaside cocktail bar for the hotel. Id. On August 7, 2008, Edlow demanded the return of his $640,000 deposit on unit 3311. He repeated this request in a Chapter 93A demand letter mailed on June 22, 2009. Edlow filed

3

this lawsuit on November 17, 2009. Among other relief, he seeks the return of the $640,000 deposit on unit 3311, the termination of the agreement to purchase unit 3311, and a rescission of his agreement to purchase unit 4310.[2]

## DISCUSSION

To survive a motion to dismiss, a complaint must allege "a plausible entitlement to relief." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 559 (2007). "While a complaint attacked by a Rule 12(b)(6) motion does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Id. at 555 (internal citations omitted). See also Rodríguez-Ortiz v. Margo Caribe, Inc., 490 F.3d 92, 95-96 (1st Cir. 2007); Berner v. Delahanty, 129 F.3d 20, 25 (1st Cir. 1997) (dismissal for failure to state a claim is appropriate if the pleadings fail to set forth "factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory"). In ruling on a motion to dismiss, the court may look to matters of public record. Boateng v. InterAmerican Univ., Inc., 210 F.3d 56, 60 (1st Cir. 2000). The court may also look to documents the authenticity of which are

---

[2]On September 18, 2008, Fairmont Hotels & Resorts announced that it would succeed Regent as the hotel operator. On December 15, 2008, the Fairmont Battery Wharf Hotel opened. On January 13, 2009, Michelin three-star chef Guy Martin opened the doors to his restaurant Sensing in the Fairmont Hotel. The spa has not been built. See Nicole C. Wong, Make room for Fairmont: Luxury hotel to open on Battery Wharf in uncertain time for hospitality industry, Boston Globe, Dec. 13, 2008, at B9; Amy Traverso, The Foodie Scene Gets Cooking (Jan. 8, 2009) http://blogs.bostonmagazine.com/chowder/2009/01/08/the-foodie-scene-gets-cooking; Fairmont, Fairmont Hotels & Resorts Expands in Boston (Sept. 18, 2008) http://www.fairmont.com/en_fa/articles/recentnews/fairmontbatterywharf.htm.

not disputed by the parties, to documents central to the plaintiff's claim, and to documents referenced in the complaint. Watterson v. Page, 987 F.2d 1, 3-4 (1st Cir. 1993).

### Count I: Breach of Contract

"To state a claim for breach of contract under Massachusetts law, a plaintiff must allege, at a minimum, that there was a valid contract, that the defendant breached its duties under its contractual agreement, and that the breach caused the plaintiff damage." Guckenberger v. Boston Univ., 957 F. Supp. 306, 316 (D. Mass. 1997) (citations omitted). To establish a breach, plaintiff has the burden of proving the failure of the defaulting party to conform to one or more of the contract's material terms. A term is material when it involves "an essential and inducing feature" of the contract. Buchholz v. Green Bros. Co., 272 Mass. 49, 52 (1930). "Though questions of materiality are usually to be determined by the trier of fact, . . . the rule is not universal. As is true of virtually any factual question, if the materiality question in a given case admits of only one reasonable answer (because the evidence on the point is either undisputed or sufficiently lopsided), then the court must intervene and address what is ordinarily a factual question as a question of law." Gibson v. City of Cranston, 37 F.3d 731, 736 (1st Cir. 1994) (discussing cognate Rhode Island law).

RBW argues that Edlow's Complaint must be dismissed as a matter of law for failing to identify any contractual term that was breached. See Harvard Law Sch. Coalition for Civil Rights v. President & Fellows of Harvard Coll., 413 Mass. 66, 71-72 (1992). RBW contends that the omission follows from the fact that no provision of the P&S Agreements obligates RBW to provide condominium residents with a hotel, restaurant, or spa.

Moreover, RBW argues that the P&S Agreements (in four separate sections) explicitly disavow any non-specified warranties, representations, or statements.

    9.    <u>CONDOMINIUM MATERIALS</u>

* * * *

    (b)    . . . . Seller expressly disclaims any representations and warranties not expressly made in this Agreement in writing concerning the condition of the Unit or common area and facilities, the operating costs or real estate taxes with respect to the Unit, Residences Condominium or Parking Rights, or any other matter. . . .

* * * *

    (d)    Other than as expressly set forth in this Agreement, neither Seller nor any agents, representatives, or employees of Seller have made any representations or warranties, direct or indirect, oral or written, express or implied, to Buyer or any agents, representatives, or employees of Buyer with respect to the condition of the Unit or the Project, their fitness for any particular purpose, or their compliance with any laws, and Buyer is not aware of and does not rely upon any such representations.

* * * *

    16.    <u>GUARANTEES AND WARRANTIES</u>

* * * *

    (b)    THE FOREGOING WARRANTIES SHALL CONSTITUTE THE ONLY WARRANTIES WITH RESPECT TO THE UNIT OR THE COMMON AREAS AND FACILITIES OF THE MASTER CONDOMINIUM, RESIDENCES CONDOMINIUM AND COMMERCIAL CONDOMINIUM AND ARE IN LIEU OF ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, ANY WARRANTY OF FITNESS, MERCHANTABILITY OR HABITABILITY BEING EXPRESSLY EXCLUDED, SELLER MAKES NO OTHER WARRANTY OR REPRESENTATION WHATSOEVER EXPRESS OR IMPLIED WITH RESPECT THERETO.

* * * *

> 21. <u>MISCELLANEOUS</u>
>
> . . . . The terms of this Agreement, together with the Condominium Presentation, constitute the entire agreement between the parties hereto and no statements made whether orally or in writing, by anyone with regard to the transaction which is the subject of this Agreement shall be construed as a part hereof unless the same be incorporated herein by writing and signed by Seller and Buyer. Buyer has relied only upon the warranties and representations set forth in the Agreement, if any, and Buyer hereby waives, to the extent permitted by law any and all implied warranties. No oral warranties representations or statements shall be considered a part hereof.

Mot. to Dismiss - Exs. 1-3.

Edlow argues that the Complaint meets the minimal pleading standard of Fed. R. Civ. P. 8(a)(2), which requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." Although Edlow is unable to cite any language in the P&S Agreements referring to a hotel, restaurant, spa, or any other proposed amenities, he argues that documents related to the "Condominium Presentation" are incorporated by section 21 of the P&S Agreements, and that the amenities are referenced in those documents.

The Condominium Presentation is defined by section 9(a) of the P&S Agreements to include:

> (i) the current forms of the Residences Condominium Documents, the Master Condominium Documents, the Commercial Condominium Documents, the Deed and the Parking Documents; (ii) a proposed estimated budget for the Residences Condominium for its initial year of operation; (iii) the Project Outline Specifications; (iv) the form of Certificate of Limited Warranty for the Unit and Common Area Limited Warranty Certificate; (v) the form of Tax Letter Agreement; (vi) the form of the 6(d) certificates and Parking Unit expense certificate; and (vii) a Specimen Owner's Title Insurance Policy and related title information . . . .

In one of the Condominium Presentation documents (the Master Deed), Edlow notes language stating that "[t]he portion of the Building constituting the Commercial Condominium and the Units are intended to be used primarily for hotel (including restaurants, bar and meeting rooms), spa, health, or fitness club, restaurants, parking garage (including car wash) and retail facilities and related purposes not otherwise prohibited by the terms and provisions of this Master Deed . . . ."  Commercial Condominium Master Deed § 8(a).  Edlow argues that this language is evidence of an implicit promise that the condominium owners would be part of a development offering these amenities.  According to Edlow, "[t]hese statements are not empty verbiage – they are covenants that run with the land."  Opp'n at 6, citing Master Deed § 14(a).

Despite the hoary reference to Blackacre,[3] Edlow's reliance on the Master Deed is a non-starter.  The amenities language in the Master Deed reserves rights to the developer, not to the purchasers of condominium units.  As RBW contends, the language of the Master Deed, read in context, defines the uses it can make of the spaces adjacent to the condominium complex.  The Master Deed language cited by Edlow includes phrases such as: "[t]he Building and Master Units may be used for any lawful purpose not otherwise prohibited by the terms and provisions of this Master Deed . . . ."; "[t]he Hotel Unit may be used only for . . . ."; "[t]he Commercial Unit shall be used only for . . . ."; and "the Commercial Condominium and the Units are intended to be used primarily for . . . ."  Master Condominium Master Deed § 8(a)-(b); Commercial Condominium Master Deed § 8(a).

---

[3]A covenant that runs with the land is more accurately used to describe a restriction binding future owners of a property rather than, as Edlow uses it, an enforceable agreement between the current parties to a real estate purchase.  See generally Roger A. Cunningham, William B. Stoebuck & Dale A. Whitman, The Law of Property 466-467 (2d ed. 1993).

These contractual provisions do not confer any affirmative rights on condominium purchasers such as Edlow.

RBW also addresses Edlow's contention that it "secretly" modified the Master Deed without the notice required by section 9(e) of the P&S Agreement(s). Section 9(e) states:

> The Seller reserves the right, upon notice and delivery of a copy to Buyer, prior to the Closing Date, to make such modifications, additions or deletions in or to any of the Residences Condominium Documents, Master Condominium Documents, Deed or Parking Documents as Seller may reasonably determine to be desirable in connection with the development and marketing of the Project . . . .

As RBW points out, a "secret" modification to the Master Deed – rededicating waterfront space for use as a hotel bar – cannot be one that was publicly filed (as Edlow admits) with the Suffolk County Registry of Deeds. Compl. ¶ 20. While Edlow alleges that "RBW had failed to advise" him of the modifications, he does not dispute RBW's contention that he received a copy of the modified Master Deed prior to the May 15, 2008 closing on unit 4310. See id. He contends that because notice was required "prior" to a closing, a second copy of the modified Master Deed was due "a reasonable time before the closing" on unit 3311 on August 15, 2008. Opp'n at 8-9. RBW argues that Edlow is reading wishful terms into the P&S Agreements when their plain language states that notice at any time prior to a closing is sufficient. The court agrees with RBW's reading.

Edlow also argues that the restricted use of the patios was not "reasonable" as required by section 9(e). The court disagrees. Section 9(e) discusses modifications desirable for the development of Battery Wharf as a whole, and not simply for the benefit of the residential units.[4]

---

[4] While the Complaint also labels the modification made to the text of the Master Deed as "obscurely buried at paragraph 7(b)(6)," Edlow fails to make any argument about

Count II: Breach of the Duty of Good Faith and Fair Dealing

"'Every contract implies good faith and fair dealing between the parties to it.'" Warner Ins. Co. v. Comm'r of Ins., 406 Mass. 354, 362 n.9 (1990), quoting Kerrigan v. City of Boston, 361 Mass. 24, 33 (1972).  Under the covenant "'neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'" Anthony's Pier Four, Inc. v. HBC Assocs., 411 Mass. 451, 471-472 (1991), quoting Uproar Co. v. Nat'l Broad. Co., 81 F.2d 373, 377 (1st Cir. 1936).  Want of good faith "carries an implication of a dishonest purpose, conscious doing of wrong, or breach of a duty through motive of self-interest or ill will." Hartford Accident & Indem. Co. v. Millis Roofing & Sheet Metal, Inc., 11 Mass. App. Ct. 998, 999-1000 (1981).  Accord Schwanbeck v. Fed.-Mogul Corp., 31 Mass. App. Ct. 390, 404 (1991), rev'd on other grounds, 412 Mass. 703 (1992).  Where no contract exists, there can be no derivative covenant of good faith and fair dealing.  Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, Inc., 412 F.3d 215, 230 (1st Cir. 2005).  Because the covenant does not import a term into a contract that the parties did not contemplate, unless a plaintiff can establish that a defendant willfully and maliciously refused to perform an express obligation of the underlying contract, the covenant does not provide an independent basis of recovery. See Uno Rests., Inc. v. Boston Kenmore Realty Corp., 441 Mass. 376, 385 (2004).  See also In re: Citigroup, Inc., 535 F.3d 45, 59 (1st Cir. 2008).  Because Edlow has failed to plead the breach of a contractual duty, his claim necessarily fails.

Count III: Rescission for Unconscionability

---

how the placement of the modification is relevant to the notice requirement of section 9(e).

Edlow argues that the 20 percent deposit ($640,000) on unit 3311 retained by RBW as liquidated damages is "unconscionably excessive" as a matter of law and public policy. Compl. ¶¶ 35-36. "Liquidated damages clauses which provide for the seller of real estate to retain the buyer's deposit are recognized in Massachusetts and . . . are a common real estate practice." Kelly v. Marx, 428 Mass. 877, 879 (1999).[5] "It is well-settled that 'a contract provision that clearly and reasonably establishes liquidated damages should be enforced, so long as it is not so disproportionate to anticipated damages as to constitute a penalty.'" NPS, LLC v. Minihane, 451 Mass. 417, 420 (2008), quoting TAL Fin. Corp. v. CSC Consulting, Inc., 446 Mass. 422, 431 (2006). A liquidated damages provision will be enforced if: (1) at the time of contracting, the actual damages that would result from a breach were difficult to ascertain; and (2) the sum agreed on as liquidated damages represents a reasonable forecast of the damages anticipated to occur in the event of a breach. Kunelius v. Town of Stow, 588 F.3d 1, 13-14 (1st Cir. 2009); Cummings Props., LLC v. Nat'l Commc'ns Corp., 449 Mass. 490, 494 (2007). Cf. Kelly, 428 Mass. at 880 ("[A] judge, in determining the enforceability of a liquidated damages clause, should examine only the circumstances at contract formation."). "[W]hether a liquidated damages clause is valid and enforceable is a question of law." Kunelius, 588 F.3d at 13. "[T]he party resisting the enforcement of the liquidated damages provision bears the burden of persuasion." Id.

---

[5]The Supreme Judicial Court has described the purpose of liquidated damages in the real estate context. "'The parties could not know what delays might ensue, what might occur in the real estate market, or how a failed sale might affect the seller's plans. Real estate purchase and sale agreements are precisely the type of contracts that are amenable to liquidated damages provision.'" Kelly, 428 Mass. at 881-882, quoting Watson v. Ingram, 881 P.2d 247, 251-252 (Wash. 1994).

11

In Kelly, the retaining by the seller of a $17,750 (5 percent) deposit on a purchase price of $355,000 for a residence as liquidated damages was held as appropriate. Outside of this case, the other precedents cited by the parties do not involve real estate purchases. Unsurprisingly, the parties have conflicting views on the significance of the lack of precedent. Edlow argues that because "no Massachusetts court has ever upheld a forfeiture of 20 [percent] in a real estate purchase and sale transaction," it must follow that no seller has ever undertaken to enforce a liquidated damages provision of 20 percent or more. Opp'n at 11. RBW responds in the obverse that "[t]he dearth of cases in the real estate context actually proves RBW's point . . . and underscores the fact that actual damages in a real estate context are notoriously difficult to ascertain, making liquidated damages provisions even *more* appropriate in that context." Reply at 8 (emphasis in original). RBW cites a factually analogous Illinois case upholding the forfeiture of a 20 percent deposit ($320,000) of the purchase price ($1.6 million) of a condominium. See Siegel v. Levy Org. Dev. Co., 538 N.E.2d 715, 716-717 (Ill. App. Ct. 1989). The court is aware of similar holdings in other jurisdictions. See Sunset West LLC v. Sutphin Mgmt. Corp., 2009 WL 1438193, at *1 (N.Y. Sup. May 22, 2009) (affirming earlier ruling that seller was entitled to 20 percent ($1.6 million) of the purchase price in liquidated damages for buyer's failure to close on $8 million real estate deal). Edlow, who bears the burden of demonstrating unconscionability, has cited no real estate cases with opposite holdings. The only arrow in his quiver is a 1966 Supreme Judicial Court case in which the 33.3 percent liquidated damages provision of a goods and services contract was struck down as "grossly disproportionate to the real damages" where the property owner canceled the installation of a fire alarm system one day after signing the agreement and before plaintiff

had performed any work. Sec. Safety Corp. v. Kuznicki, 350 Mass. 157, 158 (1966). This case, which involves the four-year negotiation of a complex real estate investment transaction between two equally sophisticated parties, is clearly distinguishable.

Count IV: Misrepresentation

Edlow alleges that "RBW's statements, acts and omissions [in 2008] constitute intentional and/or negligent misrepresentation."[6] Compl. ¶ 38. To make out a claim of intentional misrepresentation (more commonly referred to as fraud), "plaintiffs must establish that the defendants made a false representation of material fact, with knowledge of its falsity, for the purpose of inducing the plaintiffs to act on this representation, that the plaintiffs reasonably relied on the representation as true, and that they acted upon it to their damage." Cumis Ins. Society, Inc. v. BJ's Wholesale Club, Inc., 455 Mass. 458, 471 (2009), citing Masingill v. EMC Corp., 449 Mass. 532, 540 (2007).

"In order to recover for negligent misrepresentation a plaintiff must prove that the defendant (1) in the course of his business, (2) supplies false information for the guidance of others (3) in their business transactions, (4) causing and resulting in pecuniary loss to those others (5) by their justifiable reliance upon the information, and (6) with failure to exercise reasonable care or competence in obtaining or communicating the information." Nota Constr. Corp. v. Keyes Assocs., 45 Mass. App. Ct. 15, 19-20 (1998). See also Cumis, 455 Mass. at 471-472 (same); Restatement (Second) of Torts § 552 (1977). "[T]he degree of culpability a plaintiff must prove to establish liability for negligent misrepresentation is different, and less demanding, than that to establish liability for deceit."

---

[6] Fraud in the inducement is not alleged. Opp'n at 13 ("Plaintiff does not, at this juncture, claim fraud in the inducement with respect to the P&S Agreements and the statements made to him in 2004.").

13

Cummings v. HPG Int'l, Inc., 244 F.3d 16, 24 (1st Cir. 2001). Generally, when analyzing negligent misrepresentation claims, Massachusetts courts ask whether the speaker was negligent in failing to recognize the falsity of his or her statements. Id. at 25.

Under Massachusetts law, only statements of a factual nature that are false when made give rise to a cause of action for deliberate or negligent misrepresentation. See Cummings, 244 F.3d at 21. Statements of a promissory nature (and predictions regarding future events) are not "false when made," unless it can be shown that the maker never intended to carry out the promise (that is, misrepresented his intent at the time the promise was made), or knew that the predictions were false or that the promise was impossible to perform. Cohen v. State St. Bank & Trust Co., 72 Mass. App. Ct. 627, 631 (2008) (investment advisor's prediction that "long term results should be fine" was not actionable). See also McCartin v. Westlake, 36 Mass. App. Ct. 221, 230 n.11 (1994) (alleged misrepresentations to franchisees regarding franchisor's plans to open 200 franchises using venture-capital financing were not actionable as they were not statements of fact).

"'[M]ore than mere failure to perform a promise is required to support an inference of deceptive intent.'" Commonwealth v. True, 16 Mass. App. Ct. 709, 712 (1983), quoting Model Penal Code § 223.1 cmt. 3(b) at 189 (1980). See also Palmacci v. Umpierrez, 121 F.3d 781, 787 (1st Cir. 1997) ("[T]his is true even if there is no excuse for the subsequent breach.") (internal quotation marks omitted). Compare McEvoy Travel Bureau, Inc. v. Norton Co., 408 Mass. 704, 709-710 (1990) (statement by a party to the contract that it did not intend to enforce a contractual termination provision, and that the provision had been included in the contract only at the insistence of its attorneys, could form the basis for a

14

fraud claim to the extent that the statement misrepresented the actual intent of the speaker).

RBW argues that all of the statements referenced in the Complaint are forward-looking and cannot serve as the basis for an intentional or negligent misrepresentation claim. Edlow responds that he was lulled into entering the May 15, 2008 agreement when he received false assurances from RBW about progress towards the completion of Battery Wharf. Edlow alleges that RBW knew that Regent would be removed as the hotel operator and that the installation of the spa was not likely to go forward. This claim falls on the weight of the pleadings. The Complaint concedes that RBW notified Edlow on June 10, 2008, that Regent had withdrawn from the project, and gave further notice on July 7, 2008, that Regent's replacement would not offer property management or concierge services. Compl. ¶¶ 14-15. Edlow returned the signed May 15, 2008 Agreement on July 27, 2008, after he had received these two notices. Moreover, he explicitly disavowed any reliance on information not contained in the P&S Agreements and the Condominium Presentation (including representations by RBW's agents).[7] Because Edlow cannot demonstrate reliance (a necessary element), his misrepresentation claim also fails.[8]

---

[7]"Other than as expressly set forth in this Agreement, neither Seller nor any agents, representatives or employees of Seller have made any representations or warranties . . . to Buyer . . . with respect to the condition of the Unit or the Project . . . and Buyer is not aware of and does not rely upon any such representations." P&S Agreement(s) § 9(d). "Buyer has relied only upon the warranties and representations set forth in the Agreement." Id. at § 21. The question of integration is an issue of fact to be determined by the trial judge. Cambridgeport Sav. Bank v. Boersner, 413 Mass. 432, 436-437 n.7 (1992). Integration clauses are not disfavored under Massachusetts law. See Agri-Mark, Inc. v. Niro, Inc., 233 F. Supp. 2d 200, 208 (D. Mass. 2002) ("[I]ntegration clauses are well recognized and enforceable in this district.") (citations omitted).

[8]Edlow also filed a brief on the applicability of the economic loss doctrine to his misrepresentation claim. While the court found the brief informative, it is unnecessary to

Count V: Violation of Massachusetts Consumer Protection Act (M.G.L. ch. 93A)

Edlow finally alleges a cause of action under the state Consumer Protection Act, Mass. Gen. Laws ch. 93A, §§ 2 and 9. RBW argues that the Chapter 93A claims fail because they are derivative of Edlow's failed breach of contract and tort claims. See Pimental v. Wachovia Mortgage Corp., 411 F. Supp. 2d 32, 40 (D. Mass. 2006) ("Since [plaintiff] has failed to allege sustainable breach of contract or negligence claims, and the Chapter 93A claim is based upon the previous two claims, there is no basis for finding [defendant] liable under Chapter 93A."); Callahan v. Harvest Bd. Int'l, Inc., 138 F. Supp. 2d 147, 167 (D. Mass. 2001) ("Plaintiff does not allege any damage separate and apart from the breach of contract claim. [Plaintiff's] attempt to convert her breach of contract to a 93A action should fail."); Egan v. Athol Mem'l Hosp., 971 F. Supp. 37, 47 (D. Mass. 1997) (granting summary judgment where there was no evidence of the claimed underlying harm and "no unique arguments related to [the] Chapter 93A claim"); Townsends, Inc. v. Beaupre, 47 Mass. App. Ct. 747, 755 (1999) (affirming dismissal of a Chapter 93A claim where no underlying misrepresentation was shown).

Edlow's somewhat vague response is that Chapter 93A is "a statute of broad impact which creates new substantive rights and provides new procedural devices for the enforcement of those rights." Slanley v. Westwood Auto, Inc., 366 Mass. 688, 693 (1975). This may be true as a general description of the legislative purpose, but the court doubts

---

address these arguments as the lack of reliance is dispositive of his misrepresentation claim.

that an entitlement to a spa is the kind of substantive right the Supreme Judicial Court had in mind in Slanley.[9]

Count VI: Declaratory Judgment

Because all of Edlow's claims will be dismissed, the request for declaratory judgment is moot.

ORDER

For the foregoing reasons, Edlow's Complaint is DISMISSED with prejudice. The Clerk will enter judgment for RBW on all Counts of the Complaint and close the case.

SO ORDERED.

/s/ Richard G. Stearns
_____
UNITED STATES DISTRICT JUDGE

---

[9] Edlow cites examples of successful Chapter 93A claims that dealt with failures by property sellers to disclose latent defects or use restrictions (wetlands restrictions, drainage defects, poor condition of restaurant equipment, limited electrical supply, termite damage, easements). The court is not persuaded that lack of access to a spa rises to the same level of substantiality. See 940 CMR 3.16(2) (defining actionable Chapter 93A claim).